UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOANNE ST. ONGE,                          :
                                          :
        Plaintiff,                        :
                                          :
        v.                                :        CASE NO. 3:07CV01249(AWT)
                                          :
UNUM LIFE INS. CO. OF AMERICA,            :
                                          :
        Defendant.                        :
                                          :

## RECOMMENDED RULING ON CROSS-MOTIONS
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

This is an action for disability benefits under the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §
1132(a)(1)(B).  Pending before the court are the parties' cross-
motions for judgment on the administrative record (docs. #27,
28).[1]  For the reasons that follow, the motions should be denied.

The plaintiff, Joanne St. Onge, was previously employed by
Hanover Insurance Group as a Senior Litigation Adjuster for
automobile insurance.  As a benefit of her employment, she
participated in a long-term disability insurance plan (the
"Plan") administered by defendant Unum Life Insurance ("Unum").

The plaintiff suffers from chronic lower back pain.  On
September 19, 2005, she submitted a claim for disability benefits
under the Plan, stating that she could no longer work because of
her back problems.  After collecting her medical records and

---

[1]Chief Judge Alvin W. Thompson referred these motions to the
undersigned for a ruling.  (Doc. #30.)

investigating her claim, the defendant denied her application on May 2, 2006.  The denial letter acknowledged that the plaintiff suffered from back pain that imposed some limitations on her functioning, but the defendant found that those limitations did not prevent her from working, in light of the requirements of her position.  The plaintiff filed an appeal on November 10, 2006. After additional investigation, the defendant upheld its denial of benefits on April 19, 2007.

## I.   Standard of Review

The parties have styled their cross-motions as motions for judgment on the administrative record.  The Federal Rules of Civil Procedure do not specifically provide for such a motion. The recent weight of authority in this Circuit suggests that, when no motion for summary judgment has been decided, the court should treat such motions as motions for summary judgment.  See Fairbaugh v. Life Ins. Co. of N. Am., No.3:09-cv-1434(CSH), 2010 U.S. Dist. LEXIS 83337, 21-22 (D. Conn. Aug. 16, 2010) (discussing Flanagan v. First Unum Life Ins., 170 Fed. Appx. 182, 184 (2d Cir. 2006) and Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003)).  See also Sisavang Danouvong v. Life Ins. Co. of N. Am., 659 F. Supp. 2d 318 (D. Conn. 2009)(same).  There has been no summary judgment motion ruling in this case, and the court therefore should review the parties'

motions under Fed. R. Civ. P. 56.[2]

Pursuant to Fed. R. Civ. P. 56, a party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of showing the absence of any genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A party opposing a . . . motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002) (quoting Celotex, 477 U.S. at 324). The court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The parties disagree about whether the court must review the defendant's decision denying disability benefits under an "arbitrary and capricious" or de novo standard. Generally, where an ERISA Plan includes language granting discretion to the plan's administrator, a court reviews the administrator's decision under

---

[2]The parties have not filed statements of undisputed facts; however, the contours of their factual disputes are readily discerned from their papers and the record.

an arbitrary and capricious standard.  See Sullivan v. LTV
Aerospace and Defense Co., 82 F.3d 1251, 1255 (2d Cir. 1996).
"[T]he plan administrator bears the burden of proving that the
arbitrary and capricious standard of review applies."  Kinstler
v. First Reliance Std. Life Ins. Co., 181 F.3d 243, 252 (2d Cir.
1999).  The plaintiff does not dispute that the Plan includes
language granting the administrator such discretion. (See
UACL01229, UACL01252.[3])  Nonetheless, the plaintiff argues that
the court should review the denial of benefits *de novo* because of
the defendant's failure to comply with ERISA regulations
requiring an administrator to make disability determinations
within a particular period of time.  See 29 CFR 2560.503-1.  As
discussed *infra*, it is undisputed that the defendant's decision
was late.

    The Second Circuit has held that, where an administrator
does not issue a written decision within the period required by
ERISA regulations, the claim is "deemed denied" and there is no
exercise of discretion to be reviewed by the court.  Nichols v.
Prudential Ins. Co., 406 F.3d 98 (2d Cir. 2005).  Nichols held

---

[3]The administrative record is a sealed document on the court's
electronic docket, doc. #31.  The record includes two different
Bates-stamp sequences.  The first set of documents is marked "UACL"
and appears to include most of the important records.  A second
set, marked "UACL-LWOP" is mostly, but not entirely, duplicative.
It apparently is a parallel claim file created by a different
division of Unum.  (See Def's Mem., doc. #27-1, at 3 n.2.)  The
Bates-stamping on all documents appears to be in reverse
chronological order.

that a "deemed denied" claim is subject to *de novo* review rather than arbitrary and capricious review. <u>Id.</u> <u>See also</u> <u>Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan</u>, 349 F.3d 1098 (9th Cir. 2003), <u>cert. denied</u> 545 U.S. 1139 (2005); <u>Gilbertson v. Allied Signal, Inc.</u>, 328 F.3d 625, 631 (10th Cir. 2003).

The defendant argues that <u>Nichols</u> is no longer good law because of a subsequent change in the regulations. The Second Circuit has expressly postponed a determination as to whether the regulatory changes render <u>Nichols</u> obsolete. <u>See</u> <u>Krauss v. Oxford Health Plans, Inc.</u>, 517 F.3d 614, 624 (2d Cir. 2008). Several courts reviewing tardy determinations in this circuit have noted the regulatory amendments but nonetheless followed <u>Nichols</u>. <u>See</u> <u>Fershtadt v. Verizon Communications Inc.</u>, No. 07 Civ. 6963(CM), 2010 U.S. Dist. LEXIS 13937 (S.D.N.Y. Feb. 9, 2010); <u>Towner v. CIGNA Life Ins. Co.</u>, 419 F. Supp. 2d 172, 179 (D. Conn. 2006). Judge Janet Hall of this court carefully reviewed the language of the amended regulation, as well as the Department of Labor's intentions regarding scope of review, and was "persuaded that the language of the new regulations does not disturb the holding in <u>Nichols</u> that out-of-time appeal decisions by plans do not normally receive arbitrary and capricious review." <u>Towner</u>, 419 F. Supp. 2d at 179.

The defendant also attempts to distinguish <u>Nichols</u> as a case where the administrator never issued *any* decision prior to the

filing of plaintiff's lawsuit. Indeed, some courts have distinguished Nichols on that basis when dealing with cases like the one at bar, where the administrator was late but eventually did issue a decision. See Morgenthaler v. First Unum Life Ins. Co., No. 03 Civ. 5941 (AKH), 2006 U.S. Dist. LEXIS 62688, *9 (S.D.N.Y. Aug. 22, 2006); American Society for Technion-Israel Inst. of Tech., Inc. v. First Reliance Standard Life Ins. Co., No. 07 Civ. 3913 (LBS), 2009 U.S. Dist. LEXIS 82306 (S.D.N.Y. Sept. 8, 2009); Roberts v. Dominions Resources, Inc., No. 3:06cv1598(WWE), 2008 U.S. Dist. LEXIS 31183 (D. Conn. Apr. 16, 2008); Peck v. Aetna Life Ins. Co., No. 3:04-cv-1139 (JCH), 2007 U.S. Dist. LEXIS 40031 (D. Conn. June 1, 2007), citing Demirovic v. Building Service 32 B-J Pension Fund, 467 F.3d 208 (2d Cir. 2006). Other courts, however, have rejected the formalistic dichotomy between tardy-decision cases and no-decision cases and have instead applied the so-called "substantial compliance" doctrine. The substantial compliance doctrine recognizes that an overly rigid application of deadlines might be inappropriate: "Such a hair-trigger rule could inhibit collection of useful evidence and create perverse incentives for the parties." Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003).[4] Instead, courts following the substantial compliance

_____

[4]Indeed, the defendant's reading of Nichols could mean that the plaintiff who races to the courthouse as soon as the administrator misses its deadline would receive _de novo_ review while the plaintiff who waits longer (perhaps after being assured

6

doctrine are "willing to overlook administrators' failure to meet
certain procedural requirements when the administrator has
substantially complied with the regulations and the process as a
whole fulfills the broader purposes of ERISA and its accompanying
regulation." Id. Trial courts in this circuit have held that
arbitrary and capricious review might apply despite procedural
delays where there has been good-faith, substantial compliance.
See, e.g. Robinson v. Metropolitan Life Ins. Co., No. 06 Civ.
7604 (LLS), 2007 U.S. Dist. LEXIS (S.D.N.Y. Nov. 2,
2007)(applying arbitrary and capricious standard because
defendant's delay was not in bad faith and defendant remained in
contact with counsel and conducted full and fair review of the
claim); Pava v. Hartford Life & Acc. Ins. Co., No.
03CV2609(SLT)(RML), 2005 U.S. Dist. LEXIS 41753, *31 (E.D.N.Y.
Aug. 24, 2005)("[t]he case law in this Circuit indicates that
where the administrator communicates with the claimant regarding
the status of her appeal, acts in good faith, and does not delay
its decision unreasonably, its failure to comply with the
regulation deadlines may be excused"); Fershtadt v. Verizon
Communications Inc., No. 07 Civ. 6963 (CM), 2010 U.S. Dist. LEXIS
13937 (S.D.N.Y. Feb. 9, 2010) (applying de novo review because
decision issued 100 days after claimant filed his appeal was not

---

that the decision is almost ready), and therefore receives a tardy
denial before filing a lawsuit, will not receive de novo review.

in substantial compliance with deadlines); <u>Tsagari v. Pitney</u>
<u>Bowes, Inc. Long-Term Disability Plan</u>, 473 F. Supp. 2d 334 (D.
Conn. 2007) (finding substantial compliance where defendant was
just two weeks late in informing claimant that it required an
extension). <u>See also</u> <u>LaAsmar v. Phelps Dodge Corp. Life</u>, 605
F.3d 789 (10th Cir. 2010) (where decision was 170 days late and
did not occur "in the context of an on-going, good-faith exchange
of information", there was not substantial compliance).

The defendant does not deny that its appeal decision was
late.[5]  The plan provides that a decision on appeal

> will be made not later than 45 days following receipt
> of the written request for review.  If Unum determines
> that special circumstances require an extension of
> time for a decision on review, the review period may
> be extended by an additional 45 days.

(UACL01231.)  Thus, a decision is required within 90 days at
most.  ERISA regulations impose the same deadlines.  <u>See</u> 29 CFR
2560.503-1(i)(3)-(4).

---

[5]The defendant's initial benefit determination was also late.
The Plan provides for an initial disability determination within
"45 days after the claim is filed."  (UACL01232.)  The defendant
has the right to extend that time period "twice by 30 days"– with
notice to the claimant– if necessary due to matters beyond the
defendant's control. (UACL01232.)  Plaintiff's application was
filed on September 19, 2005, and it was not until May 2, 2006 that
the defendant sent a letter denying her claim. (UACL00957-62.)
Thus, despite the Plan's requirement that a decision be made within
105 days at the most, the defendant's decision took over 200 days.
The administrative record reveals that the plaintiff was incensed
by the delay.  In addition to letters of complaint and records of
her angry phone calls, the file also contains a formal complaint
she submitted to the Massachusetts Insurance Department.
(UACL00970-90.)

The plaintiff's attorney filed an appeal through the defendant's internal appeal procedure on or about November 10, 2006. (UACL00731-69.) By letter dated April 19, 2007, the defendant upheld the denial of plaintiff's claim. (UACL00027-31.) ERISA and the Plan provisions required a decision within 90 days at most; the defendant took over five months– some 160 days– to reach a determination on appeal.

The Plan's provisions also require the defendant to notify the applicant in writing if an extension beyond the original 45-day period is required: "Unum will notify you in writing if an additional 45 day extension is needed." (UACL01231.) 29 CFR 2560.503-1(i)(3) also requires such written notice of the extension. The defendant does not point to any such express notification in this case, and the court has found none.[6]

---

[6]The defendant sent counsel several letters but none of them expressly discussed an extension of the decision-making period. The defendant sent an initial letter shortly after the appeal was filed, stating that "[w]e hope to make a determination on your client's claims within 45 days of receiving your client's appeal . . ." but noting that special circumstances might necessitate an extension. (UACL-LWOP00005.) "If there are special circumstances, we are committed to making a determination no later than 90 days after receiving the appeal." (Id.) The defendant sent plaintiff's counsel a letter on December 4, 2006 "to update you on the status of Joanne St Onge's appeal." (UACL00262.) It stated that materials had been received and the file was being submitted for medical review, but the anticipated date of decision was not discussed. (UACL00262.) Another letter was sent to counsel on January 22, 2007, stating that the defendant wanted the plaintiff to undergo a functional capacities evaluation. (UACL00177-78.) Again, there was no express discussion of how long a determination would take. (Id.) On March 16, 2007, the defendant sent plaintiff's counsel another letter stating that the functional

The defendant was late, and significantly late, in issuing its decision on appeal. It also failed to expressly notify the plaintiff in writing that it was extending the decision period. Although there were some *pro forma* notices to the plaintiff's counsel, those communications were not the kind of good faith, informative communications which might excuse a modest delay. See Pava, 2005 U.S. Dist. LEXIS 41753 at *31. Nor were the delays minor. In light of the defendant's failure to comply with the deadlines, the court should conduct a *de novo* review. See Nichols v. Prudential Ins. Co., 406 F.3d 98 (2d Cir. 2005).

## II.  *De Novo* Review

 "[U]pon *de novo* review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence." Locher v. UNUM Life Ins. Co. of Am., 389 F.3d 288, 296 (2d Cir. 2004). Instead, "the court reviews all aspects of the denial of [the claim], including fact issues, to determine for itself whether the claimant should be granted or denied the requested relief." Towner v. CIGNA Life Ins. Co., 419 F. Supp. 2d 172, 181 (D. Conn. 2006)(internal citations and quotation marks omitted). The court "is free to evaluate [a treating physician's] opinion in the context of any

---

capacity evaluation report had been received. (UACL00104.) "When we have completed evaluating your client's appeal, we will send you our final determination in writing." (Id.) The denial letter followed about a month later.

factors it consider[s] relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." Locher v. UNUM Life Ins. Co. of Am., 389 F.3d 288, 296-297 (2d Cir. 2004) (internal citation and quotation marks omitted). In an ERISA action, the claimant bears the ultimate burden of demonstrating her entitlement to benefits. See Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006).

Because there is an issue of disputed fact as to the material and substantial duties of plaintiff's regular occupation, the court recommends that the pending motions be denied.

**III. Factual Background**

A.   The Plan's Definition of Disability

Under the Plan, an individual is disabled if she is found to be "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury." (UACL01248.)[7]  The phrase "material and substantial duties" is

---

[7]The "regular occupation" standard applies for the first two years of a participant's disability.  Then the standard changes: "After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."   (UACL01248.) Because the defendant found the plaintiff not disabled within the definition applicable to the first 24 months, it did not make a determination under this definition.  Therefore, the court may not consider the plaintiff's eligibility for benefits under this definition.  See Peterson v. Continental Cas. Co., 282 F.3d 112,

11

defined to mean "duties that are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified . . ." (UACL01227.) The Policy defines the term "regular occupation" as "the occupation you are routinely performing when your disability begins" but adds that "Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (UACL01226.)

The parties agree that the plaintiff's "regular occupation" included some driving, and her capability to do that driving is a part of the disability analysis. To the extent the plaintiff argues or has argued that she is disabled because of her long commute, however, courts interpreting similar disability plans have held that a claimant's commute from home to work "is not a consideration for determining disability." Nelson v. Unum Life Ins. Co. of Am., 421 F. Supp. 2d 558, 568 (E.D.N.Y. 2006). See also Adams v. Prudential Ins. Co. of Am., 280 F. Supp. 2d 731, 739 (N.D. Ohio 2003) ("[t]he Court is unpersuaded by [the plaintiff's] argument that his inability to travel to and from work is a material and substantial duty that Defendant must consider"); Chandler v. Underwriters Lab., 850 F. Supp. 728, 738 (N.D. Ill. 1994) (defendant was not arbitrary and capricious in determining that "the fortuity of where an employee lives

---

118 (2d Cir. 2002).

(something within the employee's control, unlike a truly medical disability) is not relevant to a finding of disability under the Plan").

     B.  <u>Medical Records</u>

There is no dispute that the plaintiff suffers from chronic back pain. She had surgery in January 2000, which gave her relief for several years, but her symptoms subsequently returned. (UACL00728-29.) She stopped working and filed her disability claim in September 2005.

The administrative record includes a limited number of treatment records, most of them from plaintiff's primary care physician, Paula Cullinane, M.D. On October 27, 2005, Dr. Cullinane noted that she had taken the plaintiff "out of work because of ongoing back pain and sciatic type symptoms into the right leg." (UACL01134.) Dr. Cullinane noted that the plaintiff looked well and had some lower back pain on palpation over the vertebral body and the paravertebral areas. She had been seeing a physical therapist who had suggested a TENS unit.[8] Dr. Cullinane noted that "[t]he patient does feel she might be able to work from home." (<u>Id.</u>) She added that plaintiff's employer "is willing to accommodate no heavy lifting and frequent changes of position but she has a 45 minute ride to and from work and we've left her out of work." (<u>Id.</u>) The treatment plan was to

_____

[8]TENS is "transcutaneous electrical nerve stimulation." Dorland's Medical Dictionary 1668 (28th ed. 1994).

13

try the TENS unit with medication. "I did specify that she could potentially work part time from home no more than 20 hours a week." (Id.)

Dr. Cullinane saw the plaintiff again on November 29, 2005. (UACL01135.) She reported that the plaintiff's family had experienced a house fire the week before. (Id.) The plaintiff's family got out safely, but the house was badly damaged. (Id.) Plaintiff reported that they would have to be out of the house for four months. (Id.) Plaintiff had been scheduled to go back to work part-time but did not start because "her employer has not gotten back in touch with her." (Id.) Dr. Cullinane continued her patient on her previous medications, including Percocet, and she noted that the plaintiff had a TENS unit and also attended aquatherapy.[9]

On January 9, 2006, on Dr. Cullinane's referral, the plaintiff saw Dr. Sherif Algendy at New England Pain Associates. (UACL01101-02.) He noted that the plaintiff complained of back pain radiating down her legs. (Id.) She described the pain as aching, sharp, stabbing and shooting pain with occasional numbness down the legs. (Id.) The pain started in 1999. (Id.) The

---

[9]Dr. Cullinane also described the plaintiff as tearful after her traumatic experience, and she wrote her a prescription for an anti-anxiety drug. She also suggested to plaintiff that both she and her husband should consider getting counseling regarding their stressful situation. (Id.) The medical records reflect that Dr. Cullinane subsequently treated the plaintiff with antidepressants; Dr. Cullinane related the plaintiff's depression to the stress associated with the fire. (See UACL01199, UACL01136.)

plaintiff had surgery in 2000 and felt better for a year, but then the pain returned. (Id.) The plaintiff reported that she could not do household chores, yard work, or shopping, and that the pain interfered with her social life, physical activities, and sexual activities. (Id.) Physical therapy helped, but the TENS unit did not help. (Id.) The plaintiff also complained that the pain made her depressed and irritable. (Id.) Dr. Algendy's physical examination revealed that the plaintiff was able to toe walk and could flex to 60 degrees with some discomfort. (Id.) She had pain with extension, but not with lateral lift. (Id.) "Straight leg raise was negative." (Id.) There was tenderness over the sacroiliac joint. (Id.) Dr. Algendy recommended an epidural steroid injection and adjusted the plaintiff's prescriptions. (Id.) The plaintiff had epidural steroid injections on January 17, 2006 and February 13, 2006. (UACL01103-04.)

The plaintiff saw Dr. Cullinane on January 31, 2006. (UACL01199.) Dr. Cullinane noted that the steroid injections brought some improvement in the left leg, but the right leg was still problematic and plaintiff intended to follow up with the pain clinic. (Id.) Dr. Cullinane wrote a note for plaintiff to remain out of work for another month, with plaintiff to follow up then. (Id.)

Dr. Cullinane saw the plaintiff again on March 2, 2006 (UACL01136.) She stated that the plaintiff was "felt to have

15

inoperable back disease." (Id.)  Plaintiff was using Percocet
six times daily and was concerned about addiction.  Dr. Cullinane
switched her to Oxycontin but wrote a script for Percocet as
well, to be used as needed.  She ordered an MRI.  In addition,
she referred the plaintiff to a pain clinic to see both a
physiatrist[10] and a psychologist.  (Id.)

On March 13, 2006, plaintiff had an MRI at UMass Memorial
Hospital on Dr. Cullinane's referral.  (UACL01141-42.)  The MRI
revealed: "mild posterior disc bulge" at the L1-2 level; "minimal
posterior disc bulge" at the L2-3 level; and "mild posterior disc
bulge and facet arthropathy."  At the L3-4 level, plaintiff had
"disc dessication," "foraminal disc protrusion associated with
mild to moderate foraminal narrowing," "a small left foraminal
annular tear," and "mild hypertrophy of the facet joints and
ligamentum flavum."  At the L5 S1 level, the plaintiff was status
post right laminectomy, with, *inter alia*, "considerable loss of
disc height and reactive endplate change."  In summary, the MRI
showed "post operative change at the L5-S1 level, with focal
granulation tissue surrounding the right S1 nerve root."  (Id.)
Correlating the MRI to a previous film performed in 2005, the
radiologist reported that "There is no evidence of recurrent disc
protrusion.  There is again noted to be degenerative change at

_____

[10]A physiatrist is a physician who specializes in physical
medicine.   Webster's  Third  New  International  Dictionary
(Unabridged) 1706 (1993).

16

this level including discogenic degeneration, posterior disc osteophyte formation, and bilateral intravertebral foraminal narrowing.  Overall, there has been no significant change." (Id.)

On April 6, 2006, the plaintiff underwent an electromylogram on Dr. Cullinane's referral. (UACL01094-96.)  Radiologist Mark Kaplan, M.D. summarized the EMG as follows:  "This is an abnormal study.  There is evidence of an acute right S1 or S2 radiculopathy by needle examination only.  Sensory nerve abnormalities were nonlocalizing to the affected leg, but could represent mild distal entrapments."  (UACL01096.)

C.  Physician Opinions

On September 22, 2005, just after plaintiff filed her disability claim, Dr. Cullinane submitted an "Attending Physician's Statement" stating that plaintiff would be unable to work in her regular occupation for two to four weeks. (UACL01263.)  Dr. Cullinane noted that the plaintiff had had an "L5-S1 diskectomy" on January 12, 2000.  (Id.)  Her diagnosis was low back pain and sciatica. (Id.) Dr. Cullinane stated that the plaintiff should not bend frequently, sit for more than 30 minutes or lift more than ten pounds.  (Id.)

On September 28, 2005, the defendant wrote to Dr. Cullinane requesting additional information.  The letter noted that the plaintiff's employer could accommodate "no prolonged sitting over 30 minutes, no lifting over 10 pounds and no frequent bending" and asked whether Dr. Cullinane would be able to release her for

work with those accommodations.  (UACL-LWOP00326.)  On October 13, 2005, the doctor responded: "Yes, but she lives over 3/4 hour away, so the drive in frequently exacerbates her back."  (UACL-LWOP00326-325.)  She provided a tentative return to work date of November 1, 2005.  (Id.)

On December 8, 2005, Dr. Cullinane filled out an Estimated Functional Abilities Form stating that the plaintiff was capable of lifting only 10 pounds occasionally, and that she was restricted from bending, kneeling, and crawling.  She stated that the plaintiff could work four hours at sedentary activity.  (UACL01214.)

In April 2006, the defendant submitted the plaintiff's claim for review by Dr. Alain Couturier, an in-house medical consultant to Unum who is board certified in Occupational Medicine.  (UACL01078-79, UACL01080.)  Dr. Couturier was asked by the defendant to determine whether the plaintiff would be able to sit for six to eight hours per day with the ability to change position as needed and with only occasional lifting of no more than 10 pounds. (UACL01078-79.)  Dr. Couturier summarized some of the medical records and concluded that "there is enough medical evidence to establish the insured's current ability to work a full-time sedentary job with allowance to change position as needed and avoidance of repetitive bending, twisting, lifting or reaching and no lifting > 10 lbs. on an occasional basis."  (UACL01080-81.)  Dr. Couturier noted that "[t]he medical evidence

supports a diagnosis of post-laminectomy syndrome with underlying chronic low back pain and bilateral lower extremity pain." (UACL01082.)  As to her level of function, he noted that "[t]here is very little objective clinical information available in the [attending physician's] office notes/physical exam," but that the lumbar MRI and EMI both suggested "that a right S1/S2 radiculopathy may be present." (UACL01081.)  "There is no clear indication for any surgical intervention at this point but the insured is not at [maximum medical improvement] and would benefit from the comprehensive chronic pain management program to which she appears to have been referred."  (Id.)  He concluded that the plaintiff would be able to sit for six to eight hours per day and that her functioning could improve with a successful chronic pain management program.  (UACL01080.)  He noted that there was evidence of a mood disorder which, although outside his purview, "may be adversely coloring the insured's pain perception and could potentially pose as a barrier to her return to work." (Id.)  A comprehensive pain management program, he noted, would include cognitive therapy and behavioral modification as well as physical rehabilitation. (Id.)

Dr. Couturier sent a letter to plaintiff's treating physician, Dr. Cullinane, with several written questions about the plaintiff.  Asked what accommodations would allow plaintiff to function, Dr. Cullinane responded that she would need to be able to change positions as needed and would need to avoid

prolonged sitting for more than one hour at a time. (UACL00844.)
"This has been an issue as she lives [approximately] 45 minutes
away, if traffic is heavy, she could be longer in the car."
(Id.)  In addition, plaintiff was restricted as to heavy lifting,
frequent bending or twisting.  (Id.)  Dr. Cullinane opined that
the plaintiff had not reached maximum medical improvement and
that she "has continued to require narcotic strength analgesics."
(Id.)  Although these had not negatively impacted the plaintiff's
cognitive function, "employers may feel otherwise."  (Id.)  As to
Dr. Couturier's suggestion that the plaintiff be sent for
comprehensive chronic pain management, she responded that there
was no "comprehensive" option in the immediate area but that the
plaintiff had been seeing a pain specialist and was now seeing a
physiatrist.  (Id.)

Dr. Couturier referred the case for another physician to
review.  (UACL01001.)  Dr. Suzanne Benson, who is board certified
in Physical Medicine and Rehabilitation and Electrodiagnostic
medicine, with sub-specialty certification in Pain Medicine,
reviewed the plaintiff's records and submitted her report on
April 27, 2006.  (UACL00999-1000.)  Dr. Benson concurred with Dr.
Couturier's opinion. (UACL01000.) She noted that although the
plaintiff's complaints were consistent with "lumbar post-
laminectomy syndrome," she had "demonstrated ability to work with
this condition prior to work stoppage."  (Id.) She found that the
medical records showed only a mild radiculopathy.  (Id.)  Dr.

Benson also noted that the medical records "did not support cognitive side effects from medications that would have interfered with work." (UACL0999.) She also felt that Dr. Couturier's opinion that claimant's mood could have worsened her perception of pain is "medically reasonable," particularly as the records indicated that the plaintiff was showing improvement prior to the fire at her house. (Id.)

The plaintiff's disability claim was denied on May 2, 2006. (UACL00957-62.) With her appeal, filed on November 10, 2006, the plaintiff submitted a narrative report from Dr. Cullinane. (UACL00728-29.) Dr. Cullinane's report provided some history of the plaintiff's back pain, which dated to 1999. After her surgery in January 2000, the plaintiff had a period of relief, but her symptoms returned in 2002 and 2003. She stopped work in May 2003 "because of worsening pain and prolonged car rides to her place of employment," but "[a]fter a period of therapy, rest, and medical management she was able to return to work." (UACL00729.) She noted that the plaintiff had been out of work again since September 2005 and explained that "[p]art of the reason for the prolonged time away from work is her employers' reluctance to let her work from home and their reluctance to let her return to work while taking narcotic level analgesia." (Id.) She reported that the plaintiff suffers from chronic low back pain radiating into both legs. (Id.) The pain is severe and requires OxyContin three times a day and Percocet four times a

day.  (Id.) The plaintiff is unable to sit for prolonged periods
and needs to be able to change positions and stand up. (Id.)  Dr.
Cullinane also noted that "[t]he medications that she's taking
may cloud a person's thinking" and it is therefore
"understandable her employers wish to not have her taking these
medications while working."  (Id.)  She opined that the plaintiff
was disabled and "unable to perform the duties of any gainful
occupation for which she is reasonably fitted by education,
training, or experience."  (Id.)

The plaintiff also filed an affidavit with her appeal,
stating that her pain limits her ability to do household chores,
shop, carry out physical activities, play with her children, and
sleep.  (UACL00726.)  "My medications cloud my thinking, impair
my judgment and make me feel, among other things, drowsy,
fatigued, light-headed, dizzy and sedated."  (Id.)  She explained
that her job was demanding, sometimes requiring 55 hours per week
of work.  (Id.)  Her job also required driving between 100 to 400
miles per week.  (UACL00725.)  "Also there were on occasion
situations that required me to travel over 120 miles in one
direction for a 3-day trial."  (Id.)

In a September 28, 2006 "Physician's Statement" submitted to
the defendant, Dr. Cullinane opined that the plaintiff had
"[m]oderate limitation of functional capacity" and was "capable
of clerical/administrative (sedentary) activity."  (UACL00266.)
She noted, however, that the plaintiff "required narcotic level

analgesics to achieve this level of functioning." (Id.) In a checklist of functional limitations, Dr. Cullinane noted that the plaintiff could occasionally stand, sit and walk but could never lift, carry, push or pull, bend or squat. (Id.) In an 8-hour workday, plaintiff could sit without rest for only one hour, could alternate sitting and standing for about two hours, and, with rest periods of 10 to 15 minutes, she could alternate sitting and standing for "maybe 4 hours." (UACL00265.) Dr. Cullinane opined that the plaintiff could not return to full-time work in light of those restrictions.

The defendant's appeals unit had the file reviewed by Dr. Richard Kaplan, an external physician with board certification in Physical Medicine and Rehabilitation. After summarizing the medical records, Dr. Kaplan concluded that back problems like the plaintiff's are a common condition that frequently impairs patients from doing physically demanding work or from full-time driving jobs.

> However, for a claimant to be totally impaired due to this condition, i.e. not being able to perform sedentary work with changes in position every 30 minutes and 100-400 miles driving per week would be quite unusual; such an alleged degree of impairment exceeds that which would even be expected for much more disabling diagnoses such as paraplegia; frankly, such an alleged degree of impairment in this case is simply not credible.

(UACL00214.) He added that the limitations imposed by her physician had been based predominantly on the basis of plaintiff's subjective complaints rather than through objective

measurement.  (Id.)  In addition, he stated that if the
plaintiff's claims about her cognitive limitations were true,
then she should not be driving: "if the claimant's declaration of
her cognitive limitations is accurate, then in most states
renewal of a driver's license or continued exercise of driving
privileges would subject the claimant to both criminal
prosecution and civil liability claims."  (Id.)  Dr. Kaplan
apparently found this inconsistency to significantly undermine
the credibility of plaintiff's claim, referring to it several
times in his report.  (UACL00213.)  He also noted that he had
spoken to Dr. Cullinane, who told him that the plaintiff could
return to light duty work as long as she could change positions,
avoid lifting over 10 pounds, and avoid frequent bending.  (Id.)
Although Dr. Cullinane was concerned that the plaintiff's
employer would not permit her to return to work while taking
narcotic analgesics, she agreed that the plaintiff could safely
drive.  (Id.)

On the same date as his report, Dr. Kaplan sent a letter to
Dr. Cullinane summarizing their telephone discussion.  The letter
stated, in relevant part:

> You reported that you feel the primary challenge so far
> in returning this patient to gainful employment has
> been limited cooperation from her employer.  The
> patient can safely drive a car and therefore does not
> have cognitive deficits which would preclude her return
> to work; however, you are concerned that the patient's
> employer might not permit her to return to work while
> taking prescribed narcotic analgesics.  You estimated
> that this patient would likely be able to return to a

> light duty position changing positions as needed,
> avoiding lifting over 10 pounds, and without frequent
> bending.

(UACL00185.)  Dr. Kaplan asked Dr. Cullinane to review his letter, make any comments or corrections, and sign a statement that it was an accurate representation of their conversation and her assessment of the patient.  Dr. Cullinane signed the letter on January 16, 2007.  (UACL00184.)

The defendant also had plaintiff's file reviewed by Dr. Anil Nalluri, an external physician board certified in Psychiatry. Dr. Nalluri's report stated that there was "no clinical evidence that Ms. Onge [*sic*] suffers from an impairing mental illness that would cause restrictions or limitations."  (UACL00214.)

On March 1, 2007, the plaintiff underwent a functional capacity evaluation at the defendant's request.  (UACL00090-99.) The evaluation was done by Michael Paronace, a physical therapist and site coordinator at HealthSouth in Norwich, Connecticut.  Mr. Paronace concluded that the plaintiff was capable of eight hours of work at a light work level, defined as "[e]xerting up to 20 lbs. occasionally, and or up to 10 lbs. force frequently, and/or a negligible amount of force constantly to move objects." (UACL00099.)  Mr. Parrance also noted "objective signs of difficulty with static trunk bending, repeated overhead reaching and repeated lifting from floor to shoulder height." (UACL00094.)  He indicated that she would be limited to only occasional walking, stooping, kneeling, crouching, crawling,

25

overhead reaching and floor level reaching.  (UACL00097.)

Dr. Kaplan, who had previously reviewed the plaintiff's claim, submitted an addendum to his previous report after reviewing the functional capacity evaluation.  (UACL00081-82.) He agreed with the evaluation "including recommended restrictions, as indicative of the claimant's <u>minimum</u> physical ability" but noted that the evaluation reflected some "physical deconditioning" after being out of work for some time. (UACL00082 (emphasis in original).)  He opined, based on the functional capacity evaluation, that the plaintiff "is capable of lifting up to 10 pounds frequently or 20 pounds occasionally with occasional postural changes and changes in position for 2-3 minutes every 2 hours and occasional overhead reaching."  (<u>Id.</u>)[11]

Dr. Kaplan's opinion adopted the findings of the functional capacity examination, which had found plaintiff to be limited, *inter alia*, in her ability to walk, bend, kneel and stoop.  Thus, the court understands his phrase "with occasional postural changes" to mean that plaintiff was limited to only occasional walking, bending, kneeling and stooping.  (UACL00081.)

D.   <u>Denial Letter</u>

The defendant's letter denying plaintiff's appeal reviewed the medical evidence at some length.  It concluded that the

---

[11]He noted that the functional capacity examination did not evaluate the plaintiff's cognitive abilities or her sitting tolerance, so it did not change his evaluation of her ability to drive.

plaintiff was capable of working in her regular occupation:

> [H]er occupation as an Auto Adjuster would require up
> to light capacity and when performed in the work
> environment, would allow for changes in position for
> two to three minutes every two hours.  A review of the
> file notes that driving would be 100 to 400 miles per
> week, however, the review concluded that these drive
> times would not be expected to be more than two hours
> and the work environment would allow for organization
> that [*sic*] overhead reaching would be limited to the
> occasional range.  The occupation would not be expected
> to require lifting more than 20 pounds and as normally
> performed in the national economy, could be performed
> within the restrictions and limitations opined in the
> review of the medical information.  Further, as noted
> above, Ms. Onge's [*sic*] employer was able to accomodate
> her restrictions and limitations.

(UACL0027.)

IV.  **Discussion**

The parties focus their briefs almost entirely on the
defendant's assessment of plaintiff's physical capabilities.
Although the parties agree that plaintiff had physical
limitations as a result of her back condition, their dispute
centers on the degree of her limitations.  The plaintiff argues
that the defendant failed to sufficiently defer to Dr.
Cullinane's assessments, while the defendant stands by its
assessment of her functional capacity, which essentially adopted
Dr. Kaplan's opinion.

The issue before the court is whether the plaintiff is
"limited from performing the material and substantial duties of
[her] regular occupation due to [her] sickness or injury."  The
court must address three different questions:

27

> First, what is the meaning of the term "regular
> occupation"? Second, what are the material duties of
> [plaintiff's] "regular occupation," once that term has
> been defined? . . . [T]hird . . .[, d]oes [plaintiff's]
> physical limitation prevent her from performing on a
> full-time basis at least part of her material duties?

Kinstler v. First Reliance Std. Life Ins. Co., 181 F.3d 243, 249

(2d Cir. 1999).  The first question is addressed to some extent

by the Plan's definition– it is the job of a Senior Litigation

Adjuster "as it is normally performed in the national economy,"

not necessarily as performed by the plaintiff at her employer's

office.  UACL01226. Cf.  Kinstler, 181 F.3d at 252-53 (where

undefined, the term regular occupation must take into account the

nature of the institution where the claimant was employed, since

a director of nursing at a large hospital might have a sedentary

job while a director at a smaller institution must regularly fill

in for absent nurses).

The court moves to the second question: the material duties

of plaintiff's regular occupation.  On the present record the

court is unable to determine the "material and substantial

duties" or the physical requirements of the plaintiff's regular

occupation.  The parties have barely touched on this issue in

their briefs, and yet the court's review reveals that it is

highly disputed.

The defendant mentions that, after receiving Dr. Kaplan's

opinion as to the plaintiff's functional limitations, the

defendant had a vocational consultant review the file.  (Def's

Mem., doc. #27, at 26.)  The consultant reported that "the

occupation, as it is normally performed in the national economy,

can be performed with the restrictions and limitations

presented."  (Id., citing UACL00048.)  The defendant's brief

provides no further detail regarding that vocational assessment

or the basis for those conclusions.

The court has reviewed the vocational assessment.  Shannon

O'Kelley, M.Ed., a Senior Vocational Rehabilitation Consultant,

was given the plaintiff's physical limitations (as stated by Dr.

Kaplan) and asked to determine whether "the claimant's

occupation, as it is normally performed in the national economy,

exist[s] within these restrictions and limitations." (UACL

00054.)  Ms. O'Kelley submitted her report on April 12, 2007. She

concluded that the plaintiff's position was consistent with a

"Claims Adjuster" as defined in the Dictionary of Occupational

Titles ("DOT").[12]  The Claims Adjuster position, she said,

> would be considered to require up to light capacity.
> This occupation is performed in a work environment that

---

[12]She noted that a previous reviewer had first defined
plaintiff's job as "Claims Adjuster, DOT241.217-010" but, on
gathering more information, had changed the job to "Claims
Examiner, DOT241.267-018." (UACL 00049-50.) Ms. O'Kelley, however,
believed that change was not warranted because "the claimant's
occupational duties involved a higher level of academic skill, and
industry specific complexity than that typically found within the
Claims Examiner occupation." (UACL 00049.)  Her opinion appears to
have been based on a determination that the "Claims Examiner"
position is a more responsible and higher-paid job.  (Id.)  This
note suggests, at a minimum, that the plaintiff's position, Senior
Litigation Adjuster, may not be a neat and obvious fit for the
categories used by the defendant's vocational consultants.

would allow one the ability to change positions for 2
to 3 minutes every 2 hours.  The amount of driving was
noted to be 100 to 400 miles.  The drive times
associated would not be expected to be more than 2
hours and, with proper planning, stretch breaks could
be scheduled if needed.  The work environment would
allow one control over organization of work such that
over head reaching could be limited to the occasional
range.  The occupation would not be expected to require
one to lift more than 20 pounds or more than 10 pounds
occasionally.

(UACL00049-48.)  She therefore found that the plaintiff could

perform that position.  (UACL00048.)

The plaintiff argues that the defendant misconstrued the

physical requirements of her position.[13]  She contends that

although much of her work was done from a seated position, it

also involved standing, walking and bending to assess physical

damage.  (Id. at 13.)  The defendant's denial letter on appeal

did not address whether the plaintiff's position would require

frequent walking and bending.  Both Dr. Kaplan and Dr. Cullinane

concluded that the plaintiff's ability to bend frequently is

restricted.

The defendant does not submit a copy of the DOT job

definition for a Claims Adjuster or cite to one in the lengthy

---

[13]As discussed *infra*, the plaintiff's counsel apparently had
never received a copy of the entire administrative record prior to
filing her motion, and it appears counsel did not have access to
the appeal records, including the defendant's vocational expert
report on appeal. (UACL00048-54.) Perhaps in part because of this
handicap, plaintiff's arguments about the vocational assessment are
somewhat unclear, picking and choosing among several different job
descriptions.  She cites elements from job descriptions for a
Senior Litigation Adjuster, a Senior Auto Adjuster, and a Claims
Adjuster.  (Pl's Mem., doc. #28 at 10-12.)

administrative record.[14]  However, the administrative record

includes an earlier vocational assessment conducted during the

initial benefits consideration which lends some support to

plaintiff's argument.  That earlier assessment, using the same

DOT definition that Ms. O'Kelley used, gave a different and more

detailed description of the physical requirements:

> Physical Demands of this occupation typically include:
> Lifting, Carrying, Pushing and Pulling up to 20 Lbs.
> occasionally, frequently up to 10 Lbs. or negligible
> amount constantly.  The occupation is performed from a
> seated position but would require *periods of standing/
> walking during the workday* when assessing physical
> damage.  Other physical demands typically involve: . .
> . *some periods of bending* to assess physical damages.

(UACL00879, emphasis added.)  This description refers to "periods

of bending," but does not assess how frequent such periods would

be.

In addition, O'Kelley's report contains a note that "[a]s

for the physical demands of the Claims Adjuster occupation, it

should be pointed out that the DOT profile for this occupation

encompasses a broad range of insurance adjusting activities

including the handling of personal, casualty, and property loss

claims.  It remains possible that the general classification of

---

[14]Ms. O'Kelley's report includes a series of job descriptions,
but these do not have detailed physical capacity requirements and
do not appear to be the DOT descriptions.  The court does not
decide at this point whether the DOT description for a Claim
Adjuster is necessarily the final authority as to the physical
requirements of plaintiff's position. Indeed, O'Kelley's report
suggests that the vocational consultants had some difficulty in
determining exactly how the plaintiff's position lined up with the
categories in the DOT.

this occupation as requiring a 'Light' level of physical exertion
(as per the DOT) may be based, in part on the typical physical
demands associated with adjusting non-automobile damage claims."
(UACL00048.)

In short, while the parties have scarcely addressed the
critical issue of the requirements of plaintiff's position, it is
apparent that they do not agree on this issue. Nor is the court
able to discern an obvious answer from the record. Moreover, if
the plaintiff's view prevails, then she might be disabled under
either party's interpretation of the medical record. In view of
this issue of material disputed fact, summary judgment cannot be
granted.

## V.    Conclusion

For all these reasons, the court recommends that the
plaintiff's Motion for Judgment on the Administrative Record,
doc. #28, and the defendant's Motion for Judgment on the
Administrative Record, doc. #27, be denied.

The court notes the representation of plaintiff's counsel's
that, as of the date the parties concurrently filed their
motions, plaintiff had never received a copy of the complete
administrative record. (Pl's Mem., doc. #28 at 17-18.) The
defendant protests that the plaintiff had the key documents but
appears to concede that it had not produced the entire,
post-appeal administrative record to the plaintiff's attorney
during the course of this litigation. (Def's Opp., doc. #38 at 5

n. 2.)  This case was pending for over two years before the parties filed their dispositive motions.  Any issue regarding production should have been resolved at a much earlier stage. The full administrative record has now been filed under seal, but if the defendant has not produced a full paper copy to plaintiff's counsel, it shall do so within 15 days.

Any party may seek the district court's review of this recommendation.  See 28 U.S.C. § 636(b)(written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6 & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Thomas v. Arn, 474 U.S. 140, 155 (1985); Frank v. Johnson, 968 F.2d 298, 300(2d Cir. 1992).  Failure to timely object to a magistrate judge's report will preclude appellate review.  Small v. Sec'y of Health and Human Serv.s, 892 F.2d 15, 16 (2d Cir. 1989).

SO ORDERED at Hartford, Connecticut this 20th day of September, 2010.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge
